Filed 4/28/22  In re Camryn E. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re CAMRYN E., et al., Persons Coming Under the Juvenile Court Law. | H049340<br>(Santa Clara County Super. Ct. Nos. 20JD026677, 20JD026678, 20JD026679) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAIME P.,<br><br>    Defendant and Appellant. | |

Jaime P. (mother) appeals from a juvenile court order removing three of her children from her custody pursuant to a petition filed by the Santa Clara County Department of Family and Children's Services (department) under Welfare and Institutions Code section 387.[1]  She contends the court erred in ordering the children removed.  In particular, she argues there was insufficient evidence the children would

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

face substantial harm if left in her custody, and the court should have ordered alternative measures short of removal.

For the reasons set forth below, we affirm the order.

## I. FACTS AND PROCEDURAL BACKGROUND

These dependency proceedings involve three of mother's children[2]:  Five-year-old Camryn, four-year-old Liliana, and two-year-old Scarlet (together, children).[3]  The children's father, David E., was incarcerated at the start of the dependency proceedings in October 2020 but was released from prison in March 2021.  The court has since placed the children in father's custody.  He is not a party to this appeal.

A. *Department Involvement with Family Prior to Jurisdictional Proceedings*

Prior to the dependency, the department had investigated a number of referrals related to mother's household and had provided services to her.

Following a substantiated claim of general neglect in July 2019, mother agreed to participate in a voluntary family maintenance program and received informal services and support from the department which included child and family team meetings to discuss concerns and mental health services for mother.  Mother engaged in mental health services, met with a psychiatrist, and took medication for her symptoms of anxiety and depression.  The children also received services and entered full-time daycare.  The department closed the case in May 2020.

In January 2020, the department substantiated a report of general neglect and physical abuse that included a suspicious mark on Liliana's wrist.  Mother agreed to extend voluntary family maintenance services for another three months "to improve parenting and existing mental health symptoms."

---

[2] To protect their privacy, we refer to the children as Camryn E. (Camryn), Liliana E. (Liliana), and Scarlet E. (Scarlet).  (See Cal. Rules of Court, rule 8.401(a)(2).)

[3] Mother has an older child (born in 2008) with a different father.  At the time of the dependency proceedings she did not have physical custody of that child, and he is not a subject of these dependency proceedings.

In the summer of 2020, the department received and investigated a number of additional reports of mother's general neglect of the children. In September 2020, the department held a child and family team meeting and mother agreed to participate in informal supervision services. Mother agreed to, inter alia, participate in parent education and therapy, have the children enrolled in "First Five" and receive a public health nurse, have the children receive counseling through First Five or another agency, and "not grab or squeeze the children to gain their attention."

Shortly thereafter, on October 16, 2020, law enforcement placed the children into protective custody following allegations of physical abuse and a report that Liliana (then three years old) had a visible handprint bruise on her buttocks. Mother later admitted that she had spanked the children with her hand because they would not go to sleep. Mother told the social worker she was remorseful for having spanked the children and was working with her therapist on better ways to parent the children. She also reported she was diagnosed with attention deficit hyperactivity disorder and had used marijuana since high school to help her focus.

Mother reported she was receiving psychiatric care, had begun psychiatric treatment in 2009, took medication and that, when she did not take her medication, she became angered more easily and would have "extreme 'ups and downs.' " Mother stated that her mother, the children's maternal grandmother, had moved into mother's home for additional parenting support. Mother described her relationship with maternal grandmother as "stable and loving."

B. *Jurisdictional and Early Dispositional Proceedings*

On October 20, 2020, the department filed juvenile dependency petitions under section 300, alleging that mother had neglected and failed to protect the children. After the initial hearing, mother participated in a child and family team meeting to discuss safety measures were the children to return to her care. Mother agreed to a safety plan that included attending therapy, completing a parenting without violence class, and

3

receiving as-needed respite care from her support persons, which included maternal grandmother. Maternal grandmother agreed to be part of the safety plan and to "co-parent the children" with mother and to report any child safety concerns to the department. In November 2020, the juvenile court authorized the department to release the children to mother.

On December 15, 2020, the juvenile court conducted a jurisdictional and dispositional hearing on amended section 300 petitions for the three children. Mother did not contest jurisdiction and disposition; the juvenile court found it had jurisdiction over the children and declared them dependents of the court. The juvenile court adopted the department's recommendation that the children remain in mother's custody and that she receive family maintenance services. The court also ordered a case plan.

Mother's case plan required her to participate in counseling or psychotherapy focused on the effects of trauma and physical abuse on the children and to complete both a 16-week parenting without violence class and a certified 52-week child abuser's treatment program.

C. *Case Plan Progress*

Mother completed several aspects of her case plan. She attended a parent orientation class, participated in individual therapy and a domestic violence support group, and completed a substance abuse assessment. However, at the time of the relevant evidentiary hearings in August 2021, she had not begun the 52-week children abuser's treatment program.

D. *Additional Incidents and Supplemental Petition Under Section 387*

Following the jurisdiction and disposition hearing and while under family maintenance, mother continued to struggle with parenting the children. The department facilitated multiple child and family meetings to address concerns with mother's anger, yelling at the children, and conflicts in her household. In April 2021, mother disclosed she had spanked Camryn because the kids were " 'acting up,' " and Camryn did not listen

4

when mother tried to redirect her. This incident resulted in a 10-day referral; the allegation of physical abuse was assessed to be inconclusive.

While maternal grandmother was supposed to be a support person for mother, mother and maternal grandmother had conflicts that included physical violence. Mother reported that maternal grandmother had physically abused her in front of the children on at least two occasions.

On July 1, 2021,[4] an incident occurred at mother's home that caused the police to take the children into protective custody. While the timeline and details of the events are not entirely clear, it is undisputed that mother was at home, and the children were agitated. Mother made attempts to cool down, which included placing the younger children, Liliana and Scarlet, with a next-door neighbor. Mother returned to the home with four-year-old Camryn. The situation escalated to the point that mother took a large kitchen knife and used it to stab and rip apart Camryn's teddy bears while Camryn watched. There were no reports that mother had threatened to harm Camryn. Mother later reported Camryn had been very upset and crying and saying " 'no, no, my bear.' " Mother admitted to stabbing a second bear and had also ripped up "Camryn's fancy doll."

Regarding whether the other two children were present when mother took out the knife, Camryn later told the social worker that "Lili and Scarlet were there when she smacked [her] mother but not when the mother stabbed the teddy bears." Mother's neighbor stated to the department that Scarlet and Liliana were in neighbor's home "when the mother stabbed the bears." Liliana reported (on July 16) to the social worker that "Camryn was yelling at mommy when the mother was stabbing the bears and Camryn was crying," which suggests that Liliana may have been present.

While two other persons (maternal grandmother and a friend of mother's named Jason) were present in mother's home during the stabbing of the bears, they did not

---

[4] Unless otherwise indicated, all dates occurred in 2021.

intervene. According to mother, neither person thought what mother was doing was wrong. Maternal grandmother later explained to a social worker that mother had acted appropriately as she had been trying to explain consequences and accountability to Camryn, but " 'unfortunately [mother] selected a very bad example.' "

Mother called father a number of times on July 1, and father testified at trial that mother showed him the teddy bears in a video call. He also recalled seeing Camryn crying and laying in a fetal position and observed that mother was distressed and overwhelmed. Concerned, father called the social worker, who in turn called the police.

Law enforcement arrived at the home and noted mother appeared to have great difficulty in controlling her children and her emotions. The police incident report stated that mother admitted to having spanked the children two months earlier. According to the incident report as summarized by the department, the officer who spoke to mother became "immediately concerned with the children's welfare." The officer "feared that the mother's violent actions might turn towards the children" and also "feared that the mother's extreme emotions would play a part in her reacting violently towards [the] children." Law enforcement placed the children into temporary protective custody.

The assigned Court Appointed Special Advocate (CASA) for the children, who had a scheduled visit on the day of the incident, arrived at the home and saw "[two] big stuffed animals on the floor ripped apart" and observed that mother was blaming Camryn and pushing Camryn away when Camryn tried to hug mother.

An emergency response social worker met with mother outside her home on July 1 and noted that mother had difficulty controlling her emotions and went from being hysterical and upset to calm. Mother admitted to the emergency response social worker that she yelled and screamed at the children "on a daily basis" as she struggled to parent the children. Mother also reported she was trying to teach Camryn a "lesson" by ripping the stuffed animals open "in front of the children." Mother reported she had hit the children in the past, but had not resorted to physical discipline "in over two months."

6

At an emergency child and family team meeting the next day (July 2), mother blamed father and Camryn for mother's behavior. Mother acknowledged that she struggled with anger management, marijuana use, and lack of accountability. While Mother denied spanking the children, she admitted that she "was still yelling at them almost on a daily basis." The department asked mother what other supportive services she needed. Mother "reported that she has everything in place and has the support she needs also."

On July 2, the emergency response social worker reported that the police department had stated that it was "impossible" to make a safety plan due to "mother's action of taking the knife out" and her changing moods.

On July 3, the case social worker again spoke with mother. Mother told the social worker that she knew it was wrong to stab the teddy bears but denied her actions stemmed from anger. Rather, mother explained that her actions were due only to Camryn's decision to hit mother and the emotional pain mother felt as a result. In a later conversation with the social worker, mother reported she had " 'snapped' " because she had not slept in two days and believed her medication had not been helping her to regulate her emotions. According to a later report by the social worker, mother had explained that she had "wanted to teach [Camryn] a lesson" for Camryn having slapped mother in the face.

On July 6, the Department filed a supplemental petition under section 387 seeking to remove the children from mother's custody. The petition alleged that the previous disposition had not been effective in protecting the children. The petition set forth two grounds for removal, alleging that (1) the children were at substantial risk of suffering serious physical and emotion harm in mother's care "due to [] mother's volatile behavior"; and (2) mother's violent behavior and inability to regulate her emotions placed the children at substantial risk of serious physical and emotional harm in her care.

7

The juvenile court held a hearing on the section 387 petition in early July. The court found the department established a prima facie case that the children were described by section 387 and detained the children from mother and ordered visitation. The trial court set the jurisdiction and disposition hearing on the section 387 petitions for July 28.

In anticipation of the section 387 jurisdiction and disposition hearing, the department submitted a report dated July 28 (July 28 report). In that report, the department observed that mother expressed love for the children, had been cooperative with department, had maintained communication with the social worker, was engaging in weekly therapy, and had acknowledged she had made mistakes in the July 1 incident.

The July 28 report noted that in the previous six months there had been multiple child and family team meetings to develop a safety plan to deal with mother's anger issues, her continual yelling at the children, the conflicts between mother and maternal grandmother, and the July 1 incident. However, the department had not been able to develop an appropriate or effective safety plan with the mother. The assigned CASA described that in her few visits to the home she had observed that "mother can get 'very angry quickly and anything sets her up.' "

The report noted that, on July 16, Liliana (then three years old) had reported that mother and grandmother frequently would fight and scream. She also stated that mother still spanked her and Camryn and that mother spanks "really hard." Liliana stated she " 'doesn't feel safe' with the mother because mother 'always yells.' "

The case social worker had interviewed mother's neighbor on July 19. The neighbor reported that, on July 1, she had tried to assist mother and, at one point, "Camryn and the mother 'left back home and came back really quickly, [mother] had a butcher knife in her hand and said that she was trying to get Camryn to feel what she was feeling because Camryn appeared to be careless.' "

8

In the July 28 report, the department opined that mother had not made enough progress for the children to remain safely in her care. The report noted that "[m]ost recently the mother reported that she was feeling that her current medication was no longer working for her and she was also noticing her emotions being more difficult to regulate." The social worker observed that mother "is very reactive and becomes easily triggered by the children and their behavior even while they spend most of their time in daycare during the week." The social worker noted that the children "have continued to be exposed to the mother's emotional outbursts, anger, [and] physical and verbal arguments between the mother and the maternal grandmother." The social worker stated her concerns that mother's inability to regulate her own emotions was "traumatiz[ing] and trigger[ing]" to the children, who were "showing aggressive behaviors toward others as a result of the conduct of the mother."

The social worker had ongoing concerns about mother's parenting skills and anger, which manifested in physical abuse of the children (leaving marks on their bottoms from spanking them) and, most recently, the violent stabbing of Camryn's stuffed animals. The social worker was "extremely concerned for the children's emotional well-being, as it seems that they have normalized this type of parenting from the mother and have continued to act out." Furthermore, the social worker was concerned that the children's posttraumatic stress disorder (PTSD) and behavioral challenges would "intensify" if they continued to be exposed to mother's negative parenting behaviors.

The department recommended that the juvenile court remove the children from mother's care and place them with father on a plan of family maintenance. It further recommended mother receive family reunification services.

E. *Evidentiary Hearings and August 5, 2021 Rulings*

The juvenile court conducted a two-day contested jurisdictional and dispositional hearing on the section 387 supplemental petition (on August 4 and August 5), and, on

9

August 5, it issued the ruling that mother now challenges. The juvenile court admitted into evidence both the July 28 report and a letter from mother's therapist generally reporting mother's progress and positive engagement in therapy services. The court also heard testimony from a department social worker, mother, father, mother's next-door neighbor, and maternal grandmother.

1. Testimony

Department social worker Daisy Reyna, the family's case worker, testified for the department as an expert in the provision of services in dependency cases and risk assessment. Reyna confirmed that Camryn and Liliana were diagnosed with PTSD in December 2019. Reyna testified about the progress mother had made in her case plan, including that mother had been engaging and progressing in therapy for almost a year and had completed a domestic violence program.

However, Reyna stated that mother had yet to begin the court-ordered 52-week child abuser's treatment program, although the department had made it clear that she needed to complete this program.

Reyna confirmed her assessment that mother was easily upset by the children, even though they were in daycare most of the day. Mother had recently reported that the medication she was taking for depression was not effective in helping her regulate her emotions.

A few months prior to the hearing (in April), mother had disclosed that she was engaging in physical discipline of the children. The children consistently reported that mother was still spanking them. In Reyna's opinion, the situation with mother was "escalating" given the continued spankings and the recent July 1 incident.

Mother testified that she was taking medication for depression, but she had been taking it for several years and it might be losing efficacy. Mother had discussed her medication issue with the social worker (Reyna), who had urged mother to see a psychiatrist. Mother had an appointment to see a psychiatrist in the near future and was

10

open to changing her medication. Mother also admitted that she and maternal grandmother tended to "butt heads," but their relationship had recently improved.

Regarding the July 1 incident, mother stated she had made a mistake in taking a knife to the teddy bears. She believed that the incident might not have happened if her "meds were working as effectively as they once were." Mother also noted she was sleep-deprived and struggling with physical pain (which she attributed to cysts) at the time of the incident. Mother said that Camryn had become "cold and callous" towards her minutes after they had spoken with father. Mother had picked up the kitchen knife because four-year-old Camryn was "literally feeling nothing," and mother wanted her to "feel something." On cross-examination by children's counsel, mother blamed father for failing to intervene effectively (even though not physically present). Mother conceded she had been "stuck in [her] emotions."

Maternal grandmother testified that she continued to live with mother. Their relationship had improved, they had had significantly fewer disagreements, and no serious disagreement had happened in the past month. Grandmother acknowledged she had not intervened during the July 1 incident, even though she later admitted that mother, when picking up the knife, had asked grandmother what she thought. Grandmother stated that she did not know why she had not intervened, other than observing she generally disliked confrontation as she became older and was not as "feisty" as she used to be. Grandmother wished she had intervened and would do so next time.

When questioned by the juvenile court about the prior safety plan, grandmother conceded that the purpose of the safety plan had been for her to protect the children. The court questioned grandmother why circumstances would be different the next time and asked: "What assurances can you give that things would be different the next time?" Grandmother responded: "I can assure you that I would not sit there and be quiet. I would actually speak up and do something if something needs to be done or say something that needs to be said."

11

Mother's next-door neighbor also testified for mother. She noted mother had made progress, most notably in the last three months. Neighbor also confirmed that mother and maternal grandmother had fought in the past when the children were present.

Father testified that he had been out of prison for about five months and the children were currently in his care. He described the July 1 incident. According to father, mother had appeared on video chat to be "exceedingly overwhelmed," and he had observed Camryn crying and lying in a fetal position. Mother had shown him what she had done to the teddy bears. Father hung up and called the department social worker (Reyna) because he was concerned about the children's safety.

### 2. Juvenile Court Orders

On August 5, after considering the evidence and arguments of counsel, the juvenile court issued its ruling. The court acknowledged that the evidence showed mother had made "significant and substantial progress" since the start of the dependency. However, the court concluded that it would be detrimental for the children to remain with mother.

The juvenile court found that there continued to be "incidents" that were "alarming and that need to be addressed with more services." The court noted that mother continued to minimize the July 1 incident. The court also expressed concern that mother had not started the 52-week child abuser's treatment program, which the court viewed as an essential part of the court-ordered case plan.

The juvenile court found that mother and maternal grandmother's relationship, though improving, included a history of conflict, and the court had not yet seen stability in that relationship. The court noted that the prior safety plan was premised on maternal grandmother stepping in to protect the children when necessary, but this plan had not been effective. The juvenile court found, by a preponderance of the evidence, that the allegations in the supplemental petition were true and sustained the supplemental section 387 petition.

Turning to the children's removal from mother's custody, the juvenile court determined by clear and convincing evidence that the facts supported removal. The court stated its determination was based on mother's inability to "parent the girls safely without resorting to emotional and physical abuse and without becoming emotionally disregulated, notwithstanding more than a year of voluntary services and court[-]ordered services, including mental health services." The court further stated the evidence showed "verbal and physical altercations between the mother and the maternal grandmother within this most recent period of time, which have been witnessed by the children and which mother has minimized." The court found that mother's daily marijuana use, while not a dipositive factor, exacerbated the emotional and physical abuse.

The juvenile court explained that it was concerned that mother continued to blame others, including father and Camryn, who was then only four years old. The court found that mother demonstrated a "lack of insight regarding what is necessary to keep the children safe" and a lack of understanding as to proper coparenting. The court also observed the children's "acting out behaviors" that included "a lot of yelling appear to mirror the mother's own behavior." The court found the department made reasonable efforts to prevent or eliminate the need for the removal, noting the department's provision of voluntary services as well as court-ordered family maintenance services.

The juvenile court adopted the department's findings and recommendations that the evidence supported removal of the children from mother's custody. The court found there was clear and convincing evidence that the children faced a "substantial danger" to their "physical health, safety, protection or physical or emotional well-being" if they were returned to mother and that there were no reasonable means by which to protect their "physical and emotional health without removal." (See § 361, subd. (c)(1).) Additionally, the court found by clear and convincing evidence that "one or more children" were "suffering severe emotional damage as indicated by anxiety, depression, withdrawals or untoward aggressive behavior towards themselves or others and there are

13

no reasonable means by which to protect that emotional health without a removal." (See § 361, subd. (c)(3).)[5]

Mother timely appealed.

## II. DISCUSSION

Mother contends the juvenile court's determination that the children would face a substantial danger to their health and safety if returned to mother's custody is not supported by substantial evidence.[6] She further maintains that, even assuming there was a risk of danger to the children, there were reasonable means other than removal that could have protected the children. The department counters that substantial evidence supports the juvenile court's dispositional order removing the children from mother's custody.

A. *Governing Law and Standard of Review*

Section 387 provides "the general procedure for removing a minor from the current caregiver and placing the child in a more restrictive placement." (*In re N.B.* (2021) 67 Cal.App.5th 1139, 1146.) When a section 387 petition seeks to remove a child from parental custody, the juvenile court applies the procedures and protections of section 361. (*In re D.D.* (2019) 32 Cal.App.5th 985, 990 (*D.D.*).)

---

[5] The juvenile court also determined the children could be placed with father pursuant to section 361.2, subdivision (b), as no showing had been made that they would suffer detriment from such a placement. The court ordered that the department provide father with supervised family maintenance services. At the contested hearing on August 5, mother stated to the juvenile court that she did not challenge placement with father should the children be removed from her custody and in this appeal raises no claim as to the children's placement with him.

[6] Mother's notice of appeal appears to challenge two different aspects of the juvenile court's orders. The notice does not indicate the dates of the orders she challenges but states that she is appealing from findings and orders of the juvenile court (1) "[d]enying [m]other the ability to present evidence at a prima facie hearing" and (2) "removing children from the care of their [m]other." On appeal, mother does not raise any claim related to the prima facie hearings or that she was denied the ability to present evidence.

14

To remove a child from parental custody, the court must conclude that one or more of the several specified findings has been established by clear and convincing evidence. (§ 361, subd. (c); Cal. Rules of Court, rule 5.695(c)(1); *In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).) In this case, the juvenile court's order relied on two circumstances listed in section 361, subdivision (c). The first is that set forth in section 361, subdivision (c)(1): "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) This provision has been understood as permitting removal on "broader grounds than 'substantial danger to the physical health.' " (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.) Section 361, subdivision (c)(1), also permits removal where there is clear and convincing evidence of substantial danger to the emotional well-being of the child. (*In re H.E.* (2008) 169 Cal.App.4th 710, 718–722 (*H.E.*).) "It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate. [Citation.] 'The focus of the statute is on averting harm to the child.' " (*D.D.*, *supra*, 32 Cal.App.5th at p. 996.)

The second circumstance relied upon by the juvenile court is that provided in section 361, subdivision (c)(3): "The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent." (§ 361, subd. (c)(3).)

We review a juvenile court's dispositional order of removal for substantial evidence. (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Our review of the evidence "account[s] for the level of confidence" demanded by the clear and convincing evidence standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 (*O.B.*); see *V.L.*, at p. 155

15

[concluding "that *O.B.* is controlling in dependency cases" and applying *O.B.* to removal findings].)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.) Further, "[t]he appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206 (*E.E.*).)

With these principles in mind, we turn to mother's contentions.

B. *Analysis*

1. Substantial Evidence for Removal

Mother argues there was no substantial evidence to support the dispositional removal order because there was no "substantial danger" to the children as required under section 361, subdivision (c)(1). Discussing the July 1 incident when mother stabbed Camryn's teddy bears, mother asserts she had been "sleep deprived and overwhelmed." She maintains that this incident had not resulted in any "actual harm" to the children, was the first time mother had resorted to such "extreme behavior," and was prompted by mother's "noble desire" to parent Camryn. She asserts it was "unreasonable to remove the children from mother's custody based on this one isolated incident that was unlikely to recur."

At the outset, we note that the juvenile court did not rely solely on the July 1 incident, as mother appears to claim. Rather, the juvenile court based its ruling on a number of "incidents" that it viewed as "alarming." This focus was appropriate, as the

16

juvenile court was required to consider the totality of the circumstances. (*D.D.*, *supra*, 32 Cal.App.5th at p. 995.)

Substantial evidence in the record supports the juvenile court's finding of substantial danger to the children's physical or emotional well-being. Such evidence includes mother's yelling at and spanking of the children, her inability to control her emotions, and the escalating nature of mother's reactions, including the violence of the July 1 incident, combined with mother's admission that her medication was no longer working well to keep her mood stabilized. Moreover, it is undisputed that at the time of the juvenile court's ruling mother had not started an essential part of her case plan (the 52-week child abuser's treatment program) and that this lack of compliance with her case plan put the children at risk of harm.

While it is true that there is no evidence that mother directly threatened to harm Camryn on July 1, and some evidence suggests the other two children were not present when mother stabbed the teddy bears, these circumstances are not dispositive. The juvenile court need not find, in order to remove a child, that the parent is dangerous and that the child suffered actual harm. Rather, the juvenile court's focus must be directed to averting harm to the child. (*In re K.B.* (2021) 59 Cal.App.5th 593, 605; *D.D.*, *supra*, 32 Cal.App.5th at p. 996.)

" 'The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case.' " (*E.E.*, *supra*, 49 Cal.App.5th at p. 217.) The record reveals the juvenile court carefully considered all the evidence before it. Given the evidence and the totality of circumstances discussed above, we conclude ample evidence supports the juvenile court's determination under section 361, subdivision (c)(1), that the children were in substantial danger. Mother cites no authority that convinces us the evidence presented before the juvenile court was not sufficient to support its rulings.

17

For these reasons, we decide the record as a whole contains substantial evidence "from which a reasonable fact finder could have found it highly probable" (*O.B.*, *supra*, 9 Cal.5th at p. 1011) that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody" (§ 361, subd. (c)(1)).[7] We therefore reject mother's contention that the juvenile court's findings lacked the requisite evidentiary support.

### 2. Alternatives To Removal

Mother also contends the juvenile court erred in not selecting less drastic alternatives to removal. Before removing a child under either subdivision (c)(1) or subdivision (c)(3) of section 361, the juvenile court must find that there are no reasonable means by which the child's health can be protected without removing the child from the physical custody of the child's parent. (§ 361, subds. (c)(1), (c)(3).)

Mother suggests three avenues the juvenile court should have pursued: (1) releasing the children to mother's custody under an enhanced family maintenance plan, (2) implementing a safety plan, or (3) having the social worker visit mother's home more frequently.

Regarding family maintenance, mother contends the juvenile court could have released the children to mother's custody "under a family maintenance plan with an enhanced focus on mother's yelling and anger issues." She does not explain what

---

[7] The department further contends that mother fails to address the circumstance described in section 361, subdivision (c)(3) for removal based on "severe emotional damage" and protection of "the child's physical or emotional health." The department asserts this ground served as an independent basis for the juvenile court's order. The department contends further that mother has forfeited any claim as to this basis by failing to address that ground in her opening brief. Because we conclude the juvenile court's removal order is supported by the circumstance listed in section 361, subdivision (c)(1), we do reach the department's alternative argument in support of affirmance.

18

"enhanced" services the juvenile court should have further considered. (See *H.E.*, *supra*, 169 Cal.App.4th at p. 724.) The record reflects that mother's issues with emotional instability and yelling were not recent developments, and she had already received services, including therapy and parenting classes to address her behavior and emotional dysregulation. Mother offers no support for her argument that unspecified services would have stemmed the substantial risk to the children, at least in the near term. We discern no error in the court's implied ruling that continuing to leave the children with mother, even with enhanced services to address yelling and anger, was not a reasonable means of protecting the children.

We similarly reject mother's argument that the juvenile court should have considered an alternative safety plan. She does not explain what the juvenile court could have done or what other safety plan might have been reasonable under the circumstances. To the contrary, the evidence reflects the department indeed attempted to craft a safety plan and, as noted in the July 28 report, there had been multiple child and family team meetings in the previous six months to develop a safety plan to address mother's anger issues, her continual yelling at the children, the conflicts between mother and maternal grandmother, and the July 1 incident. However, the evidence shows that, despite the department's efforts, it was not able to develop an effective safety plan with mother.

Finally, mother's suggestion that the juvenile court could have ordered more visitation by the department is unpersuasive. The department had already been doing monthly home visits, including unannounced home visits. Mother provides no authority supporting her argument that increasing the amount of department visits would have decreased the risk to the children. The record shows that the incidents were increasing in severity, mother's medication was decreasing in efficacy, and mother was yelling at the children on a daily basis.

As noted by the department, the violent July 1 incident occurred even with other persons present in mother's home (albeit they chose not to intervene), yet mother was

19

still unable to control her behavior.  We reject mother's speculative assertion that ordering more visits by the department would have mitigated the substantial risk to the children under these circumstances.

For these reasons, we decide substantial evidence supports the juvenile court's finding that there were no reasonable means to protect the children's physical and emotional health without removing them from mother's physical custody.  (§ 361, subds. (c)(1), (c)(3).)

## III.  DISPOSITION

The dispositional August 5, 2021 order removing the children from mother's custody is affirmed.

_____
                                    Danner, J.


WE CONCUR:




_____
Bamattre-Manoukian, Acting P.J.




_____
Wilson, J.




**H049340**
*In re C.E., et al.; DFCS v. J.P.*